| | | |
|---|---|---|
| FLUOROFUSION SPECIALTY CHEMICALS, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DYNATEMP INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | **COMPLAINT** |
| | ) | |
| v. | ) | |
| | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| THE CHEMOURS COMPANY FC, LLC, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MEXICHEM FLUOR, INC., d/b/a KOURA, | ) | |
| | ) | |
| Defendants. | ) | |

# Table of Contents

NATURE OF THE ACTION ................................................................................................ 4

PARTIES ......................................................................................................................... 5

JURISDICTION ............................................................................................................... 6

FACTUAL BACKGROUND .............................................................................................. 7

    The Regulated Refrigerant Industry ........................................................................... 7

    FluoroFusion's Reclamation Threat to Defendants' Dominance ................................ 10

    Koura's R-454B Contract with FluoroFusion .............................................................. 12

    Defendants Target Plaintiffs' Customers .................................................................... 18

    Defendants' Market Power .......................................................................................... 20

    Relevant Product and Geographic Markets ................................................................ 20

    Defendants' Anticompetitive Conduct ....................................................................... 20

    Harm to Competition and Antitrust Injury .................................................................. 22

COUNT I:  Contract, Combination, or Conspiracy in Restraint of Trade (Chemours and Koura) 5 U.S.C. §1 and 15 U.S.C. §15(a) ........................................................................ 23

    Horizontal Group Boycott .......................................................................................... 23

    Refusal to Deal ........................................................................................................... 24

    Exclusive Dealing ....................................................................................................... 24

    Product Tying .............................................................................................................. 26

    Intent and Injury ......................................................................................................... 27

COUNT II:  Actual and Attempted Monopolization (Chemours) 15 U.S.C. §2 and 15 U.S.C. § 15(a) ................................................................................................................ 28

    Exclusive Dealing ....................................................................................................... 28

    Product Tying .............................................................................................................. 29

    Intent and Injury ......................................................................................................... 31

COUNT III:  Conspiracy to Monopolize (Chemours and Koura) 15 U.S.C. §2 and 15 U.S.C. § 15(a) ............................................................................................................... 31

    Horizontal Group Boycott .......................................................................................... 31

    Refusal to Deal ........................................................................................................... 32

    Exclusive Dealing ....................................................................................................... 33

    Product Tying .............................................................................................................. 34

    Intent and Injury ......................................................................................................... 36

COUNT IV:  Sales Conditioned on Exclusive Dealing (Chemours and Koura) 15 U.S.C. §14 and 15 U.S.C. § 15(a) ............................................................................................. 36

COUNT V:  Breach of Contract (Koura) ........................................................................ 38

COUNT VI: Breach of Contract (Chemours) ................................................................ 39

    Chemours was bound by its agent Koura's contract. ............................................... 39

    Chemours ratified the Koura-FluoroFusion contract. ............................................ 41

    Chemours entered into an implied-in-fact contract with FluoroFusion. .................. 42

COUNT VII: Third-Party Beneficiary Breach of Contract (Koura and Chemours) .................. 43

COUNT VIII: Tortious Interference with Contract (Chemours) .................................................. 44

COUNT IX: Tortious Interference with Prospective Economic Advantage (Chemours and Koura) ................................................................................................................................... 45

COUNT X: Violation of North Carolina's Unfair and Deceptive Trade Practices Act § 75-1 *et seq.* ...................................................................................................................................... 47

PRAYER FOR RELIEF ................................................................................................................ 47

Plaintiffs FluoroFusion Specialty Chemicals, Inc. ("FluoroFusion") and Dynatemp International, Inc. ("Dynatemp") bring this action against Defendants The Chemours Company FC LLC ("Chemours") and Mexichem Fluor Inc. d.b.a. Koura ("Koura") (together, Chemours and Koura shall be known as the "Defendants") and allege as follows:

## NATURE OF THE ACTION

1.      This is an action for relief against Chemours and Koura for their unlawful suppression of competition in sales of refrigerants including R-454B, breach of contract, tortious interference with contract, and other tortious and unlawful conduct intended to restrain trade and monopolize and exclude Plaintiffs from refrigerant markets in the continental United States.

2.      In January 2024, Koura, as Chemours' distributor, entered into a valid and binding contract with FluoroFusion for the monthly purchase and sale of bulk R-454B for resale distribution by FluoroFusion, with no restrictions on its resale distribution or branding. Defendants repeatedly promised delivery of the product over a period of months but, after many unexcused delays, refused to deliver the product to FluoroFusion unless it agreed to distribute it only as generic R-454B or under Koura's brand. This demand breached the contract with FluoroFusion and was intended to injure and suppress competition by Plaintiffs. Upon information and belief, Defendants have also used their own failure to honor their delivery commitments to FluoroFusion to damage Plaintiffs' reputations in the marketplace and to target Plaintiffs' customers to convert them into customers of Defendants. According to multiple customers of Plaintiffs, Defendants have used their control over the U.S. supply of R-454B to coerce customers in the heating, ventilation, air conditioning and refrigeration industry ("HVAC/R") not only to purchase R-454B from them but to purchase their other refrigerant needs from Defendants and not to do business with Plaintiffs. Defendants are therefore

attempting to use their control over the U.S. supply of R-454B to drive competitors out of the market altogether.

3.      FluoroFusion and Dynatemp bring this action to recover damages and obtain injunctive and other equitable relief for Defendants' violations of U.S. antitrust law and for other relief under federal and North Carolina law.

## PARTIES

4.      FluoroFusion is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 3950 Powhatan Road, Clayton, North Carolina, 27520. FluoroFusion is a leading supplier of refrigerants and refrigerant recovery services in the HVAC/R market in the United States. FluoroFusion sells high quality refrigerants under the Arctic Eagle™ brand. FluoroFusion is also a leading, innovative, EPA-certified reclaimer of refrigerants.

5.      Dynatemp is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Clayton, North Carolina. Dynatemp is a leading distributor of refrigerant products in the United States and has a long history and excellent brand reputation in the United States. Dynatemp purchases refrigerants for resale to its customers from FluoroFusion and sells products under the trademark Dynatemp International™.

6.      Chemours is a Delaware limited liability company with a principal place of business at 1007 Market Street, Wilmington, Delaware. Chemours was created in 2015 by the spin-off of the Performance Chemicals business from DuPont. As part of DuPont before its spinoff and throughout its existence as an independent company following the spin-off, Chemours has for decades had a substantial share of the refrigerant market in the United States.

5

7.      Koura is a d.b.a. for Mexichem Fluor Inc., a Delaware corporation with a principal place in St. Gabriel, Louisiana and a corporate headquarters located at 950 Winter Street, Waltham, Massachusetts.

## JURISDICTION

8.      This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation). Plaintiffs bring this action to recover damages, including treble damages, costs of the suit and reasonable attorney's fees, as well as injunctive relief, arising from Defendants' violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, 14, and 15(a). The refrigerants at issue are sold by Defendants Chemours and Koura in interstate commerce, and the unlawful activities alleged herein have occurred in, and have substantially affected, interstate trade and commerce.

9.      The Court has subject matter jurisdiction over Plaintiffs' state law counts pursuant to 28 U.S.C. §1367, as they form part of the same controversy as the federal claims.

10.      The Court has personal jurisdiction over Defendant Koura pursuant to N.C. Gen. Stat. §1-75.4 (long-arm statute) because Defendant Koura has purposefully availed itself of the laws of this jurisdiction by transacting business in North Carolina, including but not limited to, soliciting FluoroFusion to purchase R-454B in North Carolina, negotiating and entering into a contract with FluoroFusion for the purchase and sale of R-454B, and agreeing to perform the contract in North Carolina.

11.      The Court has personal jurisdiction over Defendant Chemours pursuant to N.C. Gen. Stat. §1-75.4 (long-arm statute) because Defendant Chemours has purposefully availed itself of the laws of this jurisdiction by transacting business in North Carolina, including but not

limited to, marketing and distributing R-454B and other products in North Carolina, ratifying and later interfering with a contract between FluoroFusion and Koura made and to be performed in North Carolina, and promising to deliver product to FluoroFusion in North Carolina.

12.     Venue is proper under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this district as it is where the contract was negotiated and was to be delivered.

## FACTUAL BACKGROUND

### The Regulated Refrigerant Industry

13.     The Environmental Protection Agency ("EPA") regulates the manufacture, importation, and use of refrigerants under the Clean Air Act and the American Innovation in Manufacturing Act ("AIM Act"). In 2021, the EPA began implementing the AIM Act's mandate to phase down the production, importation, and use of hydrofluorocarbons ("HFCs") in refrigerants in favor of refrigerants with lower global warming potential ("GWP").[1] Among other things, the AIM Act permits the manufacture, importation, and use of HFCs only by persons holding allowances from the EPA to do so.

14.     R-454B is a designation by the American Society of Heating, Refrigerating and Air-Conditioning Engineers ("ASHRAE") for a refrigerant blend of 68.9% R32 (difluoromethane, an HFC) and 31.1% R1234yf (a hydrofluoroolefin or HFO). R32 is a regulated substance under the AIM Act, but R123yf is not. By a final rule published on May 6, 2021, the EPA approved R-454B as acceptable, subject to use conditions, for use in residential and light commercial air conditioning (AC) and heat pumps for new equipment.

---

[1] 42 U.S.C. § 7675; https://www.epa.gov/climate-hfcs-reduction/background-hfcs-and-aim-act

15.     Chemours markets and sells R-454B as Opteon™ 41XL. Chemours also distributes R-454B through several U.S. distributors.

16.     Through Koura and other business partners and distributors, Chemours has consistently represented to Plaintiffs and the refrigerant and HVAC/R industries generally that Chemours holds one or more patents giving it exclusive rights to sell and reclaim R-454B in the United States. According to Chemours and Koura, Chemours' patents cover the composition of R-454B, Chemours' manufacturing process, and the reclamation of R-454B.

17.     Despite its claims of patent protection, Chemours does not identify any patents for R-454B on its packaging, in its sales and marketing materials, or elsewhere. Chemours' practice of claiming patent protection while failing and refusing to identify relevant patents is part of a strategy to discourage and suppress competition by implicitly or explicitly threatening potential competitors with claims of infringement while creating confusion and uncertainty about the scope of alleged patent protection. This is an over-deterrence strategy intended to suppress competition beyond the scope of any patents Chemours holds.

18.     Beginning January 1, 2025, new HVAC/R systems manufactured in the United States must comply with EPA regulations requiring the use of lower-GWP refrigerants. New equipment may not be designed to use the older, higher-GWP HFC refrigerants such as R-410A. New installations of R-410A systems will also be prohibited starting January 1, 2026. See 40 CFR 85.54. Therefore, original equipment manufacturers (OEM) and aftermarket users must have commercial access to the newer, lower-GWP refrigerants permitted for installation and use beginning in 2025. At the same time, aftermarket users continue to require R-410A and other older refrigerants to service existing equipment throughout the United States, and suppliers of

refrigerants like Plaintiffs must be able to supply both the older and the newer classes of refrigerants to compete effectively.

19. To comply with these new regulations, manufacturers of new HVAC/R systems and equipment for the U.S. market have adopted newer refrigerant blends as the standard refrigerants for the design of their new equipment manufactured for the beginning in 2025. To date, manufacturers representing approximately 75% of the equipment market in the U.S. have adopted R-454B as the standard refrigerant for their new systems. Therefore, it is critical to suppliers of refrigerants to be able to supply R-454B to their OEM and aftermarket customers. Without access to this product, it is unlikely that competing suppliers will be able to survive. If they can survive at all, it will be only in small and shrinking product markets for other refrigerants that are being phased out of use.

20. There are no current "drop-in" refrigerant substitutes for R-454B that are approved by the EPA for use in systems designed to use R-454B. Therefore, there no other refrigerants that are currently commercially or technically interchangeable with R-454B. R-454B is and will be required to fill and operate systems designed for its use unless and until direct replacement substitutes are developed and approved. The ability to sell R-454B to OEM and aftermarket customers is therefore critical to competitors in the refrigerant industry.

21. Chemours has complete control over the supply and distribution of R-454B in the continental United States, from manufacturing and importation to sales to end users. Because equipment manufacturers representing approximately 75% of the new equipment market have adopted R-454B as their new standard refrigerant, Chemours controls 75% of the market for refrigerants needed for new for use in residential and light commercial air conditioning (AC) and

9

heat pumps manufactured beginning in 2025 as well as 100% of the market for refrigerants needed for equipment designed to use R-454B.

22.     Upon information and belief, Chemours has entered into agreements with several U.S. distributors, in addition to Koura, licensing them to resell R-454B, including under their own brands. But Chemours refuses to sell bulk R-454B to Plaintiffs for resale under Plaintiffs' brands. According to Koura, Chemours has refused to sell R-454B to FluoroFusion in order to target Plaintiffs customers to convert them into customers of Chemours. Koura initially communicated its opposition to Chemours' conduct but subsequently joined with it in demanding that Plaintiffs distribute R-454B only as generic or Koura-branded product.

### FluoroFusion's Reclamation Threat to Defendants' Dominance

23.     Since its formation in 2018, FluoroFusion has emerged as one of the fastest-growing EPA-certified refrigerant reclaimers in the United States, achieving significant success in the refrigerant reclamation aftermarket. Reclamation is a critical process in the lifecycle of refrigerants, aimed at recovering and restoring used or contaminated refrigerants to meet industry standards, such as AHRI 700, for reuse. This process is essential for ensuring environmental compliance, reducing greenhouse gas emissions, and conserving resources.  Reclaimers capture refrigerant gasses in HVAC/R systems in the field and process them for resale and reuse. Reclaimed refrigerants are resold in the aftermarket in competition with virgin refrigerants produced and imported by Defendants and large manufacturers. Defendants are therefore motivated to suppress the growth of reclaimers like FluoroFusion and eliminate them from the market.

24.     Refrigerant that is not reclaimed in the field ultimately is released into the atmosphere, contributing to climate change.  Therefore, promoting reclamation is a policy

priority of the EPA. Reclamation, however, is a competitive threat to large virgin refrigerant manufacturers like Chemours and Koura, because each pound of reclaimed refrigerant that is sold and used in the field is one less pound of virgin refrigerant they can sell.

25.     Defendants' exclusionary, predatory, and anticompetitive conduct in this case is an example of a common strategy they employ to control and dominate U.S. refrigerant markets by exploiting and manipulating the combined features of EPA regulation of refrigerants, antidumping import duties imposed by the U.S. Department of Commerce, and claimed patent rights to thwart and suppress competition in U.S. refrigerant markets. In a common strategy, Chemours obtains patents on emerging refrigerants and offshores production of its products to China, benefiting from tariff exemptions for patented products, while expanding U.S. facilities shortly before patent expirations. During this period, Chemours asserts patent rights to prevent entry of competition and withholds access to key refrigerant components from U.S.-based innovators and reclaimers like FluoroFusion. Once relevant patents expire, Chemours files anti-dumping suits to block importation while transitioning to other products.

26.     In the case of R-454B, Chemours successfully used its dominant market position and financial resources to shape government policy and cultivate support among various HVAC OEM manufacturers to position R-454B as the preferred next-generation refrigerant for the U.S. market, thus gaining control of 75% of the market for refrigerant needed for new equipment and systems manufactured beginning in 2025.

27.     Defendants also exploit their economic advantage from a U.S. antidumping tariff exemption granted in 2016 to create and maintain monopolistic power and restrain trade. On August 19, 2016, the International Trade Administration (ITA) published a notice titled "Hydrofluorocarbon Blends from the People's Republic of China: Antidumping Duty Order,"

commonly referred to as the "2016 Blends Order." The 2016 Blends Order imposed heavy tariffs on certain HFC blends imported from China. (Heavy tariffs have also been imposed on HFC component gasses imported from China, such as the R-32, the larger component of blend R-454B.) As a result of lobbying by Defendants and other large virgin refrigerant manufacturers, however, patented blends and blends including an HFO were exempted from the 2016 Blends Order and can be imported from China without tariffs.

28.     Although the tariffs imposed in the Blends Order are intended to protect U.S. domestic manufacturing against dumping of cheap refrigerants imported from China, Chemours exploits the exclusion of patented blends and blends containing HFOs by offshoring its own production to China and importing products duty-free, gaining an enormous and unfair economic advantage over competitors like Plaintiffs. The net results of this approach are that Chemours can use the tariff system to keep imports prohibitively expensive to competitors while importing its own products duty-free. This allows Chemours to import and sell virgin refrigerants below the price of reclaimed refrigerants, resulting in low reclamation rates, slow or nonexistent development of reclamation technology and infrastructure, and the continued introduction of refrigerants from China into the air and water in the United States.

29.     Defendants see U.S.-based innovative reclaimers like FluoroFusion as a threat to their cycle of market control and supra-competitive profits through this manipulation and exploitation of the patent system, EPA regulation, and import duties. Defendants therefore seek to drive FluoroFusion and other reclaimers out of the market.

**Koura's R-454B Contract with FluoroFusion**

30.     In January 2024, Koura and Chemours announced that they had entered into an agreement for Koura to distribute R-454B in the U.S. HVAC aftermarket. A press release by

Koura stated: "'Chemours is committed to helping the HVAC industry transition to lower GWP solutions,' said Shawn McCloskey, Americas Senior Director of Thermal & Specialized Solutions at Chemours. 'Given the strong market adoption, this agreement will help deliver reliable supply and quality throughout the equipment lifespan.'"

31.     FluoroFusion and Koura have had a strong commercial relationship dating to several years prior to January 2024. As part of their relationship, FluoroFusion has purchased bulk refrigerants such as R-134A for resale from Koura. As is customary in the industry, FluoroFusion and Koura's prior practice and course of dealing is to agree on estimated monthly and annual volumes for purchases the following year based on FluoroFusion's forecast needs.

32.     FluoroFusion packages R-134a purchased from Koura for sale and distribution by FluoroFusion and Dynatemp under their brands as Arctic Eagle™ 134a and Dynatemp International™ 134a:



33.     In January 2024, Koura approached FluoroFusion with an offer to sell bulk R-454B for resale and distribution. Koura explained that it had acquired access to the product through a swap agreement with Chemours but lacked the infrastructure to move it through the aftermarket. Specifically, Koura explained that it did not have direct customers or a sales team in place to distribute the product. Koura asked FluoroFusion if it could take delivery of 1 to 2 truckloads of R-454B per month to satisfy the terms of Koura's swap agreement with Chemours. FluoroFusion agreed.

34.     Koura and FluoroFusion entered into a valid and binding contract for the monthly sale and purchase of bulk R-454B for resale and distribution by FluoroFusion, including at least 14 loads for the first year (2024), with no restrictions on branding or resale. The agreed pricing of R-454B was structured like FluoroFusion's existing R-134a business with Koura, where a volume is agreed upon, and the pricing floats monthly based on market conditions.

35.     Consistent with the parties' prior dealings, Koura promised that FluoroFusion could package the material in any type of box or cylinder, with the goal of moving the product into the market pursuant to Koura's swap agreement with Chemours. Koura stated that its swap agreement Chemours imposed no restrictions on packaging and confirmed that FluoroFusion could distribute the product in its own Arctic Eagle™ branded boxes and cylinders.

36.     On January 19, 2024, FluoroFusion submitted a purchase order to Koura for its first load of 35,000 pounds of R-454B at ███. and asked Koura to confirm acceptance. (**Exhibit A** (PO); **Exhibit B** (email).)

37.     On January 20, 2024, Koura confirmed acceptance of the PO by return email and promised delivery of the first load of R-454B in March. (**Exhibit B**.)

38.     On March 8, 2024, FluoroFusion asked for an update on the anticipated delivery date for the first shipment of R-454B. (**Exhibit B**.)

39.     During April 2024, Koura again repeatedly promised delivery of the first load of R-454B by the end of the month as well as further deliveries. On April 9, FluoroFusion emailed Koura Senior Sales Manager Scott Koerper: "After the first load of R454B, how many more are available? We would like to get another in the schedule. With the A2L's[2] its [sic] important that we have a very good packaging plan to not hold too much inventory." The following day, Mr. Koerper replied: "Your first load should be delivered later this month. I'll get you the date soon. I can get you another load in May or June." (**Exhibit C**.)

40.     On April 15, Mr. Koerper emailed: "We finally have Chemours set up. I should hear from them in the next few days on a delivery date to you. It will be in late April, my guess. Is that OK? I can get you another load in May or June. Let me know." (**Exhibit D.**)

41.     On Thursday, April 18, FluoroFusion emailed back that it was ready to take delivery of the first load of R-454B, and Mr. Koerper replied: "I hope to have a delivery date to you by the end of the week." (**Exhibit E**.)

42.     On April 23, Koura emailed to ask when FluoroFusion wanted the first load delivered. On April 24, FluoroFusion requested delivery on April 29. (**Exhibit F**.) Koura and FluoroFusion exchanged several emails regarding the delivery details and offloading time needed. On April 26, FluoroFusion again followed up requesting confirmation of the delivery details, but Koura responded, "still waiting on Chemours to get back with me, I have emailed several times and left a message."  (Id.)

---

[2] A2L is an ASHRAE safety (flammability) classification.

43.     On May 2, 2024, FluoroFusion again asked Koura when its first shipment would be delivered and asked why it was taking so long. Koura then responded that Chemours required forty-five days' advance notice for a shipment and that Chemours had procedures to be followed for the first shipment. (**Exhibit F**.)

44.     On May 6, 2024, Koura emailed to advise FluoroFusion that shipment had been further delayed and stated it would be delivered "by the end of this month." (**Exhibit G**.)

45.     Before Chemours would agree to shipment of R-454B to FluoroFusion, Chemours requested that FluoroFusion participate in a safety call.

46.     On May 14, 2024, Chemours employee, Andrew Pansulla, initiated a conference by sending a calendar invitation for a Teams videoconference call with personnel from Chemours, Koura, and FluoroFusion to discuss tech service items regarding R-454B shipment and the offload process with FluoroFusion. (**Exhibit H**). This Teams meeting scheduled by Chemours took place on May 16, 2024. All three companies participated, with Chemours setting the agenda and taking the lead, to discuss Chemours' offload procedures and schedule for its R-454B shipments to FluoroFusion. During the call, Chemours and Koura promised delivery to FluoroFusion for June 5, 2024.

47.     Yet again, however, Defendants breached their promises. On June 4, 2024, Mr. Koerper emailed FluoroFusion, saying: "Chemours is delaying your 454B delivery. I have a call with them later this week to see why. I'm shocked since we were told a while ago, we were good to go." (**Exhibit I**.)

48.     In response to Koura's request, on June 5, 2024, FluoroFusion shared copies of its Arctic Eagle™-branded packaging for the R-454B. (**Exhibit J**.)

49.     Despite continued follow-up inquires and requests for delivery by FluoroFusion in the succeeding months, Defendants continued to stall and never delivered even the first promised shipment of R-454B. Koura advised that Chemours was not responding to Koura's multiple emails and calls attempting to get shipment and delivery confirmation from Chemours.

50.     On or about September 4, 2024, Koura then informed FluoroFusion that R-454B would not be delivered to it unless FluoroFusion agreed that it would distribute the product only under Koura's brand or as generic, unbranded product and not under FluoroFusion's Arctic Eagle™ brand. Koura specifically demanded that all advertising and marketing materials and packaging for the product would bear either Koura's brand or would be generic/unbranded. Koura informed FluoroFusion that Chemours' commercial team had intervened and was refusing to ship R-454B to FluoroFusion, so Chemours could target FluoroFusion's customers, which Koura described as unethical. Subsequently, however, Koura joined with Chemours in demanding that Plaintiffs distribute R-454B only under Koura's brand or as a generic product so that Koura could build its own aftermarket brand. Upon information and belief, Chemours and Koura entered into an agreement and conspiracy to exclude Plaintiffs from the market unless they distributed the product only as Koura-branded or generic product.

51.     In addition, Chemours refused to ship the product unless FluoroFusion agreed to a broad non-disparagement agreement under which it would be barred from ever making any public statements critical of Chemours, any of its employees, any of its products, or even any refrigerant gasses containing fluorine atoms. Thus, Chemours has sought to use its market power not only to suppress competition but to silence any criticism not only of itself, its employees, and products but of virtually any refrigerant product in the market.

**Defendants Target Plaintiffs' Customers**

52.     In April 2024, FluoroFusion and Dynatemp began experiencing significant sales declines due to the anti-competitive conduct of Chemours and Koura. This decline is a direct result of Defendants' refusal to deliver R-454B to FluoroFusion to FluoroFusion, while targeting FluoroFusion's and Dynatemp's customers with their monopoly on the product.

53.     This anti-competitive strategy is intended to, and does, stifle the growth of Arctic Eagle™ and Dynatemp International™-branded refrigerants in the U.S. market. As a result, FluoroFusion and Dynatemp have suffered significant lost sales and missed business opportunities.

54.     According to multiple customers of Plaintiffs, while Defendants were unlawfully refusing to deliver R-454B to Plaintiffs, Defendants targeted Plaintiffs' customers to tarnish Plaintiffs' reputations as being unable to supply R-454B and to use Defendants' control over access to R-454B as leverage to convert Plaintiffs' customers into Defendants' customers not only for R-454B but for the customers' other refrigerant needs as well, thereby damaging Plaintiffs' reputations, disrupting their customer relationships, and causing them many millions of dollars in lost sales and profits.

55.     In parallel, Koura began purchasing R-410A refrigerant from India to launch into the U.S. refrigerant aftermarket, using R-454B as a stepping-stone to build its own aftermarket brand, which is virtually nonexistent in the U.S. market.

56.     Koura and Chemours have conspired to suppress competition by FluoroFusion and Dynatemp by denying them access to R-454B while using their own refusal to perform the contract with FluoroFusion to negatively market against Plaintiffs to their own customers.

57.     According to multiple customers of Plaintiffs, Defendants have used their exclusive control over the supply of R-454B to force Plaintiffs' customers to purchase their other refrigerant needs from Defendants as well. Upon information and belief, Defendants have conditioned customers' access to R-454B upon their agreement to purchase other refrigerants such as R410A, R407C, R407A, R438A, R422B, R134a, R448A, R449A, and R513A from Defendants and not from Plaintiffs. Defendants thus have used their control over the U.S. supply of R-454B to suppress and eliminate competition in the larger market for other refrigerants as well.

58.     As a result of these unlawful, anti-competitive actions, Plaintiffs have suffered significant lost sales and profits, incurred substantial costs, and suffered damage to their reputations.

59.     These actions have also hindered FluoroFusion's ability to continue innovating, expanding customer options, and supporting the important policy objectives established by Congress in the Clean Air Act and the AIM Act, particularly the reduction of environmental impacts caused by refrigerants.

60.     As a reclaimer, FluoroFusion is committed to making heating and cooling more sustainable, but Defendants' anti-competitive conduct stifles US based competition and smothers innovation in the aftermarket.

61.     FluoroFusion incurred significant expenses to prepare to receive, package, and distribute R-454B. In addition, Koura and Chemours' refusal to deliver R-454B to FluoroFusion resulted in many millions of dollars in lost sales and profits. At least forty-five customers in FluoroFusion's and Dynatemp's distribution network called or emailed requesting to purchase R-454B. Plaintiffs could not fill these orders, because of Koura's and Chemours' wrongful and

unlawful refusal to deliver the R-454B they had promised to FluoroFusion. Plaintiffs in addition have suffered substantial reputational harm as a direct result of Defendants' conduct.

## Defendants' Market Power

62.     Defendants possess substantial power in the refrigerant market and the market for R-454B in the continental United States. Chemours controls 100% of the U.S. market for R-454B and approximately 75% of the market for refrigerants meeting the EPA's regulations for use in residential and light commercial air conditioning (AC) and heat pumps taking effect January 1, 2025. Chemours' dominant control over the supply and price of R-454B also gives Defendants substantial power over the market for other refrigerants. Defendants also possess substantial power in the U.S. market for all refrigerants.

## Relevant Product and Geographic Markets

63.     Defendants have sought to monopolize and restrain competition in the markets for R-454B and for all refrigerants, which Defendants seek to control by tying them to R-454B. These markets include both OEM and aftermarket submarkets and wholesale and retail customers and service providers.

64.     Based on regulatory and legal limitations and economic factors such as transportation costs, the relevant geographic market is the continental United States. The market for R-454B and other refrigerants supplied by both Plaintiffs and Defendants is a national market extending throughout the continental United States.

## Defendants' Anticompetitive Conduct

65.     Defendants' anti-competitive conduct includes, without limitation, the following acts:

a. Koura had an existing commercial relationship with FluoroFusion in which it sold refrigerants such as R-134a to FluoroFusion for resale distribution under FluoroFusion and Dynatemp's brands. After Koura agreed to sell R-454B to FluoroFusion for resale on similar terms and without any restrictions on its ability to resell to its customers, Chemours approved FluoroFusion to receive R-454B, and Defendants promised to begin delivering the product, Defendants abruptly and in combination and conspiracy to exclude Plaintiffs from the market reversed course and conditioned delivery of product on the demand that Plaintiffs sell and distribute the product only under the Koura brand or as an unbranded, generic product.

b. Chemours further demanded that Plaintiffs agree to a covenant not to make any public comment reflecting negatively in any way not only on Chemours but on any of its products or employees and even on any refrigerant gas containing fluorine atoms – effectively any refrigerant in the market.

c. While unlawfully refusing to deliver R-454B to FluoroFusion, Defendants have targeted Plaintiffs' customers to convert them into customers of Defendants, using the leverage of their control over commercial access to R-454B. According to multiple customers, Defendants have conditioned their access to R-454B on the agreement to purchase their other refrigerants from Defendants as well.

d. Defendants claim that Chemours holds patent rights to manufacture and market R-454B, but Chemours does not identify any relevant patents on its product labeling or marketing materials and refuses to identify any relevant patents. By claiming to have relevant patent rights but failing and refusing to identify the patents, Chemours and Koura suppress competition by implicitly or expressly raising the threat of claims of

21

infringement while maintaining a cloak of secrecy and uncertainty about the existence and scope of any patent rights held by Chemours.

e. In or about August or September 2024, Defendants entered into an agreement and conspiracy to subject Plaintiffs to a horizontal boycott by excluding them from access to R-454B to supply to their customers under their brands.

66. There is no reasonable economic justification for Defendants' actions. Their predatory and anti-competitive tactics serve no economic purpose but to suppress and limit competition in order to maintain and maximize their dominant market power and reap supra-competitive profits from their scheme.

**Harm to Competition and Antitrust Injury**

67. Defendants' anti-competitive scheme and predatory and exclusionary tactics have caused harm to competition by depriving competitors of the ability to supply R-454B to their own and to other prospective customers. Customers have therefore been deprived of the choice of buying R-454B from Plaintiffs and other suppliers in competition with Chemours and Koura. In addition, Defendants have used their control over the supply of R-454B to force customers to buy other refrigerants from Defendants and have therefore deprived customers of choice among refrigerant suppliers altogether. Defendants' predatory and anticompetitive conduct reduces choices of suppliers available to customers and all but eliminates price and service competition in the market.

68. FluoroFusion and Dynatemp have suffered injury and damages as a direct result of Defendants' conduct. Their injuries and damages include, without limitation, lost sales and profits, out-of-pocket costs, lost customers, and damage to their reputations. Without access to R-454B, they have been unable to supply it to their customers, and Defendants have been able to

exploit Plaintiffs' lack of access to this product to convert Plaintiffs' customers for sales of other products from Defendants as well. These injuries and damages are ongoing and cumulative. In the long term, Defendants' exclusionary tactics will starve Plaintiffs of revenue and capital and prevent Plaintiffs from continuing to provide customers with competitive pricing and service and developing and expanding innovative refrigerant recovery technologies and services.

**COUNT I: Contract, Combination, or Conspiracy in Restraint of Trade (Chemours and Koura) 5 U.S.C. §1 and 15 U.S.C. §15(a)**

69.     FluoroFusion and Dynatemp incorporate the allegations set forth in the paragraphs preceding Count I above.

70.     Defendants entered into a contract, combination, or conspiracy to unreasonably restrain trade by, without limitation, enforcing a boycott against Plaintiffs, refusing to deal with Plaintiffs, using exclusive dealing tactics to exclude Plaintiffs and other suppliers from the market, and tying product sales to exclude Plaintiffs and other suppliers.

**Horizontal Group Boycott**

71.     Defendants and Plaintiffs are direct competitors in selling and distributing refrigerants to customers in the HVAC/R industry.

72.     Koura, as a distributor for Chemours, entered into a valid and binding contract with FluoroFusion to sell it R-454B for resale distribution under its own brand. Defendants repeatedly affirmed their obligation to sell and deliver R-454B to FluoroFusion.

73.     Defendants then joined in a contract, combination, or conspiracy to boycott Plaintiffs by refusing to sell and deliver R-454B, as they were contractually obligated to do, unless Plaintiffs agreed to market the R-454B only as Koura-branded or generic, unbranded product. Defendants' boycott was specifically intended to protect Defendants against competition by Plaintiffs.

74.     Defendants' boycott is unlawful per se. Even if it is not unlawful per se, it is unlawful under the rule of reason.

## Refusal to Deal

75.     FluoroFusion and Koura have an established long-term business relationship wherein FluoroFusion purchases refrigerants for resale in the HVAC/R aftermarket and supplies and fills cylinders with refrigerants for Koura. The relationship between FluoroFusion and Koura has existed absent any statutory obligation/duty on behalf of any party.

76.     Koura and FluoroFusion's relationship has been mutually advantageous and profitable in the HVAC/R aftermarket.

77.     Throughout the parties' relationship, Koura has sold bulk refrigerants to FluoroFusion which FluoroFusion then filled into individual cylinders and branded under FluoroFusion's own Arctic Eagle™ brand or Dynatemp International™ brand.

78.     On or about January 18, 2024, Koura as Chemours' distributor entered into a valid and enforceable contract with FluoroFusion to sell R-454B to it for resale and distribution with no branding or other restrictions on resale. Koura and Chemours subsequently and repeatedly promised delivery of R-454B to FluoroFusion.

79.     Defendants subsequently refused to sell and deliver R-454B to FluoroFusion unless it agreed to distribute it only as Koura-branded or generic product.

## Exclusive Dealing

80.     Upon information and belief, Chemours and Koura have imposed a condition of exclusive dealing upon HVAC/R customers in the United States by conditioning customer access to R-454B on customers' agreement to purchase their other refrigerant requirements from Defendants as well and not from Plaintiffs.

81.　Upon information and belief, Defendants leverage their control of the U.S. supply of R-454B to force customers to purchase other refrigerants necessary to service and refill existing systems and equipment from Defendants.

82.　By conditioning access to purchase R-454B on customers' purchase of their other refrigerants from Defendants, Defendants are depriving customers of the option of buying other refrigerants from Plaintiffs or other suppliers.

83.　At all times relevant to this action, Defendants have had substantial market power in the nationwide market for R-454B and the nationwide market for refrigerants needed for new HVAC/R equipment beginning in 2025.

84.　Given their dominant position in the market, Defendants possess market power sufficient to coerce customers into purchasing their other refrigerants from Defendants.

85.　Defendants' unlawful exclusive dealing arrangements are intended to and do substantially lessen competition, are inherently anticompetitive, and tend to create and maintain their dominant market power.

86.　Defendants scheme of conditioning access to R-454B on exclusive dealing with them deprives customers of the choice of purchasing from Plaintiffs or other suppliers. Because Defendants have unlawfully withheld R-454B from Plaintiffs, customers must choose to purchase all of their refrigerants from Defendants or forego access to R-454B. As purchasers must purchase R-454B due to EPA regulation, this hampers competition in the refrigerant market to the detriment of purchasers, and, ultimately, consumers.

87.　Although Plaintiffs' refrigerant offerings are superior to Chemours in price and customer service, Defendants' anti-competitive exclusive-dealing arrangements have stifled and will continue to stifle Plaintiffs' ability to compete in sales of refrigerants, and customers will be

deprived of the choice to buy from them. Moreover, Chemours' anticompetitive scheme has decreased price competition in the refrigerant market.

88.     Further, the imposition of this unlawful condition has the effect of intentionally creating an impossible barrier to the re-entry of Plaintiffs into the market, because Defendants have failed to deliver R-454B to them to distribute to their customers.

89.     Defendants conduct forecloses and suppresses competition in a substantial share of the market for refrigerants and the market for R-454B.

**Product Tying**

90.     Upon information and belief, Defendants unlawfully tie sales of other refrigerant products to customers to sales of R-454B by requiring customers to buy other refrigerants from Defendants as a condition to access to R-454B. The tying product in Defendants' scheme is R-454B, and the tied products are other refrigerants.

91.     According to multiple customers of Plaintiffs, Defendants leverage their control over the supply of R-454B to coerce customers into purchasing their other refrigerant needs from Defendants.

92.     By refusing to sell R-454B on its own, Defendants have conditioned customers' ability to purchase R-454B on purchases of other products from Defendants, thereby depriving purchasers of Chemours' R-454B of the option of buying other refrigerants from Plaintiffs or other suppliers.

93.     At all times relevant to this action, Defendants have had substantial market power in the nationwide market for R-454B, sufficient to force customers to buy tied products from them.

94.     There are substantial legal, regulatory, technological, and financial barriers to entry in the market for R-454B.

95.     Given Defendants' dominant position in market for R-454B, Defendants possess market power sufficient to coerce customers into purchasing the tied products from them.

96.     Due to Defendants' anti-competitive conduct, customers are coerced to purchase other refrigerants from Defendants or forego access to R-454B. This hampers competition in the refrigerant market to the detriment of purchasers, and, ultimately, consumers.

97.     Although Plaintiffs' refrigerant offerings are superior to Defendants' in price and customer service, Defendants' anticompetitive tying arrangement has stifled —and continues to stifle—sales of Plaintiffs' refrigerants, and purchasers have not realized the benefits of purchasing from Plaintiffs. Moreover, Defendants' anticompetitive tying arrangement has decreased price competition in the refrigerant market.

### Intent and Injury

98.     Defendants' exclusionary and predatory conduct is intended to unreasonably restrain trade, is inherently anticompetitive, and has harmed and will continue to harm competition in the market for refrigerants and in the market for R-454B in the Continental United States.

99.     Defendants' exclusionary and predatory conduct is unlawful per se. Even if it is not unlawful per se, it is unlawful under the rule of reason

100.    Plaintiffs have been, and will continue to be, injured by Defendants' conduct and have suffered and will continue to suffer damages as a direct result of it.

**COUNT II:  Actual and Attempted Monopolization (Chemours) 15 U.S.C. §2 and 15 U.S.C. § 15(a)**

101.    FluoroFusion and Dynatemp incorporate the allegations set forth in the paragraphs preceding Count I above.

102.    Chemours has willfully monopolized and/or attempted to monopolize the markets for R-454B and for all refrigerants in the United States by, without limitation, using its dominant market power over R-454B to require customers to buy other products from it and not to do business with Plaintiffs, and tying sales of other products to sales of R-454B.

**Exclusive Dealing**

103.    Upon information and belief, Chemours has imposed a condition of exclusive dealing upon HVAC/R customers in the United States by conditioning customer access to R-454B on customers' agreement to purchase their other refrigerant requirements from Chemours as well and not from Plaintiffs.

104.    Upon information and belief, Chemours leverages its control of the U.S. supply of R-454B to force customers to purchase other refrigerants necessary to service and refill existing systems and equipment from Chemours.

105.    By conditioning access to purchase R-454B on customers' purchase of their other refrigerants from Chemours, Chemours is depriving customers of the option of buying other refrigerants from Plaintiffs or other suppliers.

106.    At all times relevant to this action, Chemours has had substantial market power in the nationwide market for R-454B and the nationwide market for refrigerants needed for new HVAC/R equipment beginning in 2025.

107.    Given its dominant position in the market, Chemours possesses market power sufficient to coerce customers into purchasing their other refrigerants from Chemours.

108.    Chemours' unlawful exclusive dealing arrangements are intended to and do substantially lessen competition, are inherently anticompetitive, and tend to create and maintain their dominant market power.

109.    Chemours' scheme of conditioning access to R-454B on exclusive dealing with them deprives customers of the choice of purchasing from Plaintiffs or other suppliers. Because Chemours has unlawfully withheld R-454B from Plaintiffs, customers must choose to purchase all of their refrigerants from Chemours or forego access to R-454B. As purchasers must purchase R-454B due to EPA regulation, this hampers competition in the refrigerant market to the detriment of purchasers, and, ultimately, consumers.

110.    Although Plaintiffs' refrigerant offerings are superior to those of Chemours in price and customer service, Chemours' anticompetitive exclusive-dealing arrangements have stifled and will continue to stifle Plaintiffs' ability to compete in sales of refrigerants, and customers will be deprived of the choice to buy from them. Moreover, Chemours' anticompetitive scheme has decreased price competition in the refrigerant market.

111.    Further, the imposition of this unlawful condition has the effect of intentionally creating an impossible barrier to the re-entry of Plaintiffs into the market, because Chemours has failed to deliver R-454B to them to distribute to their customers.

112.    Chemours' conduct forecloses and suppresses competition in a substantial share of the market for refrigerants and the market for R-454B.

### Product Tying

113.    Upon information and belief, Chemours unlawfully ties sales of other refrigerant products to customers to sales of R-454B by requiring customers to buy other refrigerants from

Defendants as a condition to access to R-454B. The tying product in Chemours' scheme is R-454B, and the tied products are other refrigerants.

114.    According to multiple customers of Plaintiffs, Chemours leverages its control over the supply of R-454B to coerce customers into purchasing their other refrigerant needs from Chemours.

115.    By refusing to sell R-454B on its own, Chemours has conditioned customers' ability to purchase R-454B on purchases of other products from Chemours, thereby depriving purchasers of Chemours' R-454B of the option of buying other refrigerants from Plaintiffs or other suppliers.

116.    At all times relevant to this action, Chemours has had substantial market power in the nationwide market for R-454B, sufficient to force customers to buy tied products from them.

117.    There are substantial legal, regulatory, technological, and financial barriers to entry in the market for R-454B.

118.    Given Chemours' dominant position in market for R-454B, Chemours possesses market power sufficient to coerce customers into purchasing the tied products from them.

119.    Due to Chemours' anti-competitive conduct, customers are coerced to purchase other refrigerants from Chemours or forego access to R-454B. This hampers competition in the refrigerant market to the detriment of purchasers, and, ultimately, consumers.

120.    Although Plaintiffs' refrigerant offerings are superior to those of Chemours in price and customer service, Chemours'anticompetitive tying arrangement has stifled —and continues to stifle—sales of Plaintiffs' refrigerants, and purchasers have not realized the benefits of purchasing from Plaintiffs. Moreover, Chemours' anticompetitive tying arrangement has decreased price competition in the refrigerant market.

**Intent and Injury**

121.    Chemours' exclusionary and predatory conduct is intended to unreasonably restrain trade, is inherently anticompetitive, and has harmed and will continue to harm competition in the market for refrigerants and in the market for R-454B in the Continental United States.

122.    Chemours' exclusionary and predatory conduct is unlawful per se. Even if it is not unlawful per se, it is unlawful under the rule of reason.

123.    Plaintiffs have been, and will continue to be, injured by Chemours' conduct and have suffered and will continue to suffer damages as a direct result of it.

**COUNT III:  Conspiracy to Monopolize (Chemours and Koura) 15 U.S.C. §2 and 15 U.S.C. § 15(a)**

124.    FluoroFusion and Dynatemp incorporate the allegations set forth in the paragraphs preceding Count I above.

125.    Defendants possess monopoly power in the market for refrigerants and the market for R-454B in the continental United States.

126.    Defendants have combined or conspired to willfully acquire and/or maintain monopoly power in the market for refrigerants and the market for for R-454B in the continental United States by, without limitation, enforcing a horizontal group boycott against Plaintiffs, refusing to deal with Plaintiffs, using their dominant market power over R-454B to require customers to buy other products from them, not to do business with Plaintiffs, and tying sales of other products to sales of R-454B.

**Horizontal Group Boycott**

127.    Defendants and Plaintiffs are direct competitors in selling and distributing refrigerants to customers in the HVAC/R industry.

128. Koura, as a distributor for Chemours, entered into a valid and binding contract with FluoroFusion to sell it R-454B for resale distribution under its own brand. Defendants repeatedly affirmed their obligation to sell and deliver R-454B to FluoroFusion.

129. Defendants then joined in a contract, combination, or conspiracy to boycott Plaintiffs by refusing to sell and deliver R-454B, as they were contractually obligated to do, unless Plaintiffs agreed to market the R-454B only as Koura-branded or generic, unbranded product. Defendants' boycott was specifically intended to protect Defendants against competition by Plaintiffs.

130. Defendants' boycott is unlawful per se. Even if it is not unlawful per se, it is unlawful under the rule of reason.

**Refusal to Deal**

131. FluoroFusion and Koura have an established long-term business relationship wherein FluoroFusion purchases refrigerants for resale in the HVAC/R aftermarket and supplies and fills cylinders with refrigerants for Koura. The relationship between FluoroFusion and Koura has existed absent any statutory obligation/duty on behalf of any party.

132. Koura and FluoroFusion's relationship has been mutually advantageous and profitable in the HVAC/R aftermarket.

133. Throughout the parties' relationship, Koura has sold bulk refrigerants to FluoroFusion which FluoroFusion then filled into individual cylinders and branded under FluoroFusion's own Arctic Eagle™ brand or Dynatemp International™ brand.

134. On or about January 18, 2024, Koura as Chemours' distributor entered into a valid and enforceable contract with FluoroFusion to sell R-454B to it for resale and distribution

with no branding or other restrictions on resale. Koura and Chemours subsequently and repeatedly promised delivery of R-454B to FluoroFusion.

135. Defendants subsequently refused to sell and deliver R-454B to FluoroFusion unless it agreed to distribute it only as Koura-branded or generic product.

**Exclusive Dealing**

136. Upon information and belief, Chemours and Koura have imposed a condition of exclusive dealing upon HVAC/R customers in the United States by conditioning customer access to R-454B on customers' agreement to purchase their other refrigerant requirements from Defendants as well and not from Plaintiffs.

137. Upon information and belief, Defendants leverage their control of the U.S. supply of R-454B to force customers to purchase other refrigerants necessary to service and refill existing systems and equipment from Defendants.

138. By conditioning access to purchase R-454B on customers' purchase of their other refrigerants from Defendants, Defendants are depriving customers of the option of buying other refrigerants from Plaintiffs or other suppliers.

139. At all times relevant to this action, Defendants have had substantial market power in the nationwide market for R-454B and the nationwide market for refrigerants needed for new HVAC/R equipment beginning in 2025.

140. Given their dominant position in the market, Defendants possess market power sufficient to coerce customers into purchasing their other refrigerants from Defendants.

141. Defendants' unlawful exclusive dealing arrangements are intended to and do substantially lessen competition, are inherently anticompetitive, and tend to create and maintain their dominant market power.

142.     Defendants scheme of conditioning access to R-454B on exclusive dealing with them deprives customers of the choice of purchasing from Plaintiffs or other suppliers. Because Defendants have unlawfully withheld R-454B from Plaintiffs, customers must choose to purchase all of their refrigerants from Defendants or forego access to R-454B. As purchasers must purchase R-454B due to EPA regulation, this hampers competition in the refrigerant market to the detriment of purchasers, and, ultimately, consumers.

143.     Although Plaintiffs' refrigerant offerings are superior to those of Defendants in price and customer service, Defendants' anticompetitive exclusive-dealing arrangements have stifled and will continue to stifle Plaintiffs' ability to compete in sales of refrigerants, and customers will be deprived of the choice to buy from them. Moreover, Defendants' anticompetitive scheme has decreased price competition in the refrigerant market.

144.     Further, the imposition of this unlawful condition has the effect of intentionally creating an impossible barrier to the re-entry of Plaintiffs into the market, because Defendants have failed to deliver R-454B to them to distribute to their customers.

145.     Defendants conduct forecloses and suppresses competition in a substantial share of the market for refrigerants and the market for R-454B.

**Product Tying**

146.     Upon information and belief, Defendants unlawfully tie sales of other refrigerant products to customers to sales of R-454B by requiring customers to buy other refrigerants from Defendants as a condition to access to R-454B. The tying product in Defendants' scheme is R-454B, and the tied products are other refrigerants.

147.     According to multiple customers of Plaintiffs, Defendants leverage their control over the supply of R-454B to coerce customers into purchasing their other refrigerant needs from Defendants.

148.     By refusing to sell R-454B on its own, Defendants have conditioned customers' ability to purchase R-454B on purchases of other products from Defendants, thereby depriving purchasers of R-454B of the option of buying other refrigerants from Plaintiffs or other suppliers.

149.     At all times relevant to this action, Defendants have had substantial market power in the nationwide market for R-454B, sufficient to force customers to buy tied products from them.

150.     There are substantial legal, regulatory, technological, and financial barriers to entry in the market for R-454B.

151.     Given Defendants' dominant position in market for R-454B, Defendants possess market power sufficient to coerce customers into purchasing the tied products from them.

152.     Due to Defendants' anti-competitive conduct, customers are coerced to purchase other refrigerants from Defendants or forego access to R-454B. This hampers competition in the refrigerant market to the detriment of purchasers, and, ultimately, consumers.

153.     Although Plaintiffs' refrigerant offerings are superior to those of Defendants in price and customer service, Defendants' anticompetitive tying arrangement has stifled —and continues to stifle—sales of Plaintiffs' refrigerants, and purchasers have not realized the benefits of purchasing from Plaintiffs. Moreover, Defendants' anticompetitive tying arrangement has decreased price competition in the refrigerant market.

**Intent and Injury**

154.     Defendants' exclusionary and predatory conduct is intended to unreasonably restrain trade, is inherently anticompetitive, and has harmed and will continue to harm competition in the market for refrigerants and in the market for R-454B in the continental United States.

155.     Defendants' exclusionary and predatory conduct is unlawful per se. Even if it is not unlawful per se, it is unlawful under the rule of reason.

156.     Plaintiffs have been, and will continue to be, injured by Defendants' conduct and have suffered and will continue to suffer damages as a direct result of it.

**COUNT IV:  Sales Conditioned on Exclusive Dealing (Chemours and Koura) 15 U.S.C. §14 and 15 U.S.C. § 15(a)**

157.     FluoroFusion and Dynatemp incorporate the allegations set forth in the paragraphs preceding Count I above.

158.     Upon information and belief, Chemours and Koura have imposed a condition of exclusive dealing upon HVAC/R customers in the United States by conditioning customer access to R-454B on customers' agreement to purchase their other refrigerant requirements from Defendants as well and not from Plaintiffs.

159.     Upon information and belief, Defendants leverage their control of the U.S. supply of R-454B to force customers to purchase other refrigerants necessary to service and refill existing systems and equipment from Defendants.

160.     By conditioning access to purchase R-454B on customers' purchase of their other refrigerants from Defendants, Defendants are depriving customers of the option of buying other refrigerants from Plaintiffs or other suppliers.

161. At all times relevant to this action, Defendants have had substantial market power in the nationwide market for R-454B and the nationwide market for refrigerants needed for new HVAC/R equipment beginning in 2025.

162. Given their dominant position in the market, Defendants possess market power sufficient to coerce customers into purchasing their other refrigerants from Defendants.

163. Defendants' unlawful exclusive dealing arrangements are intended to and do substantially lessen competition, is inherently anticompetitive, and tends to create and maintain their dominant market power.

164. Defendants' scheme of conditioning access to R-454B on exclusive dealing with them deprives customers of the choice of purchasing from Plaintiffs or other suppliers. Because Defendants have unlawfully withheld R-454B from Plaintiffs, customers must choose to purchase all of their refrigerants from Defendants or forego access to R-454B. As purchasers must purchase R-454B due to EPA regulation, this hampers competition in the refrigerant market to the detriment of purchasers, and, ultimately, consumers.

165. Although Plaintiffs' refrigerant offerings are superior to those of Defendants in price and customer service, Defendants' anticompetitive exclusive-dealing arrangements have stifled and will continue to stifle Plaintiffs' ability to compete in sales of refrigerants, and customers will be deprived of the choice to buy from them. Moreover, Defendants' anticompetitive scheme has decreased price competition in the refrigerant market.

166. Further, the imposition of this unlawful condition has the effect of intentionally creating an impossible barrier to the re-entry of Plaintiffs into the market, because Defendants have failed to deliver R-454B to them to distribute to their customers.

167.    Defendants conduct forecloses and suppresses competition in a substantial share of the market for refrigerants and the market for R-454B.

168.    Plaintiffs have been, and will continue to be, injured by Defendants' conduct and have suffered and will continue to suffer damages as a direct result of it.

### COUNT V:  Breach of Contract (Koura)

169.    FluoroFusion and Dynatemp incorporate the allegations set forth in the paragraphs preceding Count I above.

170.    In January 2024, Koura and FluoroFusion entered into a valid and enforceable contract for the monthly sale and purchase of bulk R-454B for an indefinite term at prices to float based on market conditions. The parties agreed that in the first year (2024), FluoroFusion would purchase at least 14 truckloads of R-454B produced by Chemours and sold by Koura.

171.    In their negotiations, Koura and FluoroFusion discussed FluoroFusion's ability to sell R-454B under its own Arctic Eagle™ brand name, and Koura and FluoroFusion agreed that there would be no restrictions on FluoroFusion's branding or resale of the product, which Koura confirmed was consistent with its swap agreement with Chemours.

172.    Dynatemp is an intended third-party beneficiary of the contract between FluoroFusion and Koura.

173.    Consistent with Koura and FluoroFusion's prior and customary practice and course of dealing, FluoroFusion submitted a purchase order for its first shipment of 35,000 pounds of R-454B on January 19, 2024, for the total purchase price of ███████.

174.    On January 20, 2024, Koura confirmed acceptance of the FluoroFusion's purchase order in writing by email and promised delivery in March. Koura also promised delivery of additional future shipments in writing.

175.    In numerous emails in the following months, Koura reaffirmed its contract and repeatedly promised delivery of the first and subsequent shipments of R-454B, including a May 6, 2024 email that that Koura "promises will get it delivered to you by the end of the month."

176.    Despite Koura's agreement to regularly supply bulk R-454B to FluoroFusion, and despite Koura's repeated promises throughout 2024 to deliver R-454B on multiple dates, Koura breached its contract when it failed to ship the product. For the entire year of 2024, FluoroFusion did not receive even a single truckload of the promised R-454B.

177.    FluoroFusion was, at all relevant times, ready, willing, and able to perform its obligations under the agreement with Koura, namely, to pay for R-454B delivered pursuant to the parties' agreement and monthly purchase orders.

178.    As a direct result of Koura's breach of its agreement to supply R-454B to FluoroFusion, and its repeated failures to deliver any product despite repeated promises to do so, Plaintiffs have suffered and will continue to suffer damages including, without limitation, millions of dollars in lost sales and profits, out-of-pocket expenses, and damage to their reputation in the market.

### COUNT VI:  Breach of Contract (Chemours)

179.    FluoroFusion and Dynatemp incorporate the allegations set forth in the paragraphs preceding Count I above.

### Chemours was bound by its agent Koura's contract.

180.    Upon information and belief, through a swap agreement, Chemours engaged Koura as its approved and authorized agent to distribute and sell to the U.S. aftermarket bulk R-454B.

181. At all relevant times, Koura's negotiations and agreement with FluoroFusion were undertaken with Koura acting as Chemours' approved and authorized U.S. aftermarket distributor of R-454B. In this capacity, Koura had actual or apparent authority as Chemours' agent to enter into contracts on behalf of Chemours related to the sale of Chemours' R-454B.

182. When Koura approached FluoroFusion, offering to sell R-454B, and during the contract negotiations between Koura and FluoroFusion, Koura advised FluoroFusion of Koura's status as Chemours' approved distributor with authorization to sell R-454B to FluoroFusion.

183. Koura represented to FluoroFusion that its swap agreement with Chemours imposed no restrictions on packaging or resale, and Koura confirmed that FluoroFusion would be permitted to distribute R-454B in its own Arctic Eagle™ branded packaging. Koura and FluoroFusion entered into a valid and enforceable contract for the sale and purchase of bulk R-454B to FluoroFusion, with no restrictions on resale.

184. Upon information and belief, the swap agreement between Koura and Chemours gave Koura actual authority to bind Chemours to contracts for the sale of R-454B.

185. Even if Koura did not have actual authority, Koura had apparent authority to bind Chemours. Chemours publicly held out Koura as its authorized agent for the sale of R-454B refrigerant in the U.S. aftermarket. In a public press release announcing the Koura/Chemours agreement, Chemours Senior Director, Shawn McCloskey, touted the agreement's role in supporting the HVAC industry's transition to new lower GWP options, stating that Chemours' agreement with Koura "will help deliver reliable supply" of R-454B.

**Chemours ratified the Koura-FluoroFusion contract.**

186.     After Koura and FluoroFusion entered into the contract for R-454B, Chemours became actively involved in the contract, and it ratified and manifested mutual assent to be bound by the terms of the contract through both words and conduct.

187.     Chemours, as the manufacturer of the purchased R-454B, and as the entity who controlled shipping of the product, manifested mutual assent to the terms of the contract when it provided multiple delivery windows to Koura for FluoroFusion's first shipment.

188.     For example, on April 15, 2024, Chemours communicated to Koura, who in turn communicated to FluoroFusion, that Chemours was "finally . . . set up," and that within "the next few days" Chemours would provide a confirmed delivery date to Koura for the first shipment of R-454B to FluoroFusion.

189.     In May 2024, Chemours, both through its agent Koura and directly, requested and initiated a meeting with FluoroFusion to discuss technology service requirements and safe offloading procedures for delivery of R-454B. FluoroFusion, Chemours, and Koura all participated in that meeting on May 16, 2024. Chemours took the lead by communicating directly with FluoroFusion staff in advance of, and at, the May 16 meeting. Chemours set the agenda and discussion topics for the meeting and led the meeting. At the conclusion of the call, Chemours approved FluoroFusion's readiness and capability to receive R-454B and promised a June 5, 2024 delivery date of the delayed R-454B.

190.     Chemours breached its express promise to ship R-454B to FluoroFusion, when, on June 4 – the day prior to the delivery date promised by Chemours – Chemours communicated, through its agent Koura, that Chemours was again delaying the shipment, with no explanation, and subsequently continuing to refuse to deliver the product.

191.    Chemours is liable as a principal on the initial contract duly made by Koura, its

agent, with FluoroFusion, because Koura had actual authority to bind Chemours, or Koura had

apparent authority where FluoroFusion reasonably but mistakenly believed Koura had authority

where Chemours held Koura out as its authorized agent related to the sale of R-454B.

192.    Even if Koura did not have authority to bind Chemours, Chemours ratified and

assented to the contract by its subsequent words and course of conduct, where Chemours

communicated approval to Koura that they were "good to go," and Chemours confirmed to

Koura that it was set up and prepared to provide confirmed delivery to FluoroFusion under the

contract.

193.    Chemours' ratification of, and assent to, the contract is further established by its

seeking additional performance from FluoroFusion in a safety meeting in exchange for

Chemours' express agreement to ship the R-454B under the original January 19 purchase order,

and Chemours' express promise of a June 5, 2024 delivery.

**Chemours entered into an implied-in-fact contract with FluoroFusion.**

194.    Alternatively, if Chemours was not a party to the original contract, Chemours and

FluoroFusion entered into a separate but related contract, either express or implied-in-fact, when

Chemours bargained for and received separate performance from FluoroFusion – participation in

Chemours' safety meeting – in exchange for a promise to begin delivering the R-454B to

FluoroFusion. FluoroFusion fully performed on May 16, by completing Chemours' safety

meeting, with the expectation of a promise of delivery from Chemours.

195.    Dynatemp was an intended third-party beneficiary of the express or implied-in-

fact contract between Chemours and FluoroFusion.

196.     Following FluoroFusion's performance on May 16, Chemours made an express promise that it would deliver the R-454B as identified in the purchase order. There was a meeting of the minds, and Chemours' promise of delivery is evidence of mutual assent.

197.     As a direct result of Chemours' breach of its agreement to supply R-454B to FluoroFusion, and its repeated failures to deliver any product despite repeated promises to do so, Plaintiffs have suffered and will continue to suffer damages including, without limitation, millions of dollars in lost sales and profits, out-of-pocket expenses, and damage to their reputation in the market.

**COUNT VII:  Third-Party Beneficiary Breach of Contract (Koura and Chemours)**

198.     FluoroFusion and Dynatemp incorporate the allegations set forth in the paragraphs preceding Count I above.

199.     Upon information and belief, Plaintiffs were intended third-party beneficiaries of a valid and enforceable contract between Koura and Chemours for the distribution of R-454B.

200.     At the time of contracting, Koura and Chemours contemplated and intended that refrigerant distributors and suppliers like FluoroFusion and Dynatemp would receive a direct financial benefit under their swap agreement for R-454B.  Koura issued a press release touting its status as Chemours' distributor, although Koura did not itself have necessary sales and distribution capacity.

201.     Chemours controlled the production and shipping of all R-454B ordered by Koura for FluoroFusion, had active and direct dealings with both Koura and FluoroFusion, and was a direct participant to the same or greater extent as Koura and FluoroFusion for contract and performance related issues.

202.     Upon information and belief, Chemours breached its contract with Koura by failing to ship the R-454B to FluoroFusion, and Plaintiffs were adversely impacted as third-party beneficiaries of that contract.

203.     At the time FluoroFusion agreed to purchase regular, large quantities of R-454B from Koura, Plaintiffs were aware that Koura and Chemours had a pre-existing contractual relationship for the distribution of R-454B.  Plaintiffs understood that Chemours would benefit financially pursuant to its swap agreement with Koura.

204.     Upon information and belief, Chemours breached its agreement with Koura by failing and refusing to deliver R-454B to FluoroFusion.

205.     As a direct result of Chemours' breach of its swap agreement with Koura, Plaintiffs have suffered and will continue to suffer damages including, without limitation, millions of dollars in lost sales and profits, out-of-pocket expenses, and damage to their reputations in the market.

### COUNT VIII:  Tortious Interference with Contract (Chemours)

206.     FluoroFusion incorporates the allegations preceding Count I of this Complaint as if fully restated.

207.     Koura and FluoroFusion entered into a valid, enforceable contract for the sale and purchase of R-454B for resale by FluoroFusion with no branding or other restrictions.

208.     Under its contract with FluoroFusion, Koura was contractually obligated to and promised to deliver R-454B produced by Chemours to FluoroFusion pursuant to the contract, with no restrictions on FluoroFusion's resale of R-454B. FluoroFusion, in turn, promised to pay Koura ███ per pound for the first shipment of R-454B, with an agreement that pricing for future shipments would float based upon market conditions.

209.    Chemours had actual knowledge of the contract between Koura and FluoroFusion.

210.    Upon information and belief, Chemours took intentional, direct action to induce Koura to breach its contract with FluoroFusion.

211.    Koura breached its contract with FluoroFusion by failing to deliver R-454B upon the inducement and instructions of Chemours.

212.    Chemours' actions to interfere with the R-454 Agreement were willful, malicious, and unjustifiably designed to stifle competition, suppress Plaintiffs' brand recognition and development, and impede Plaintiffs' ability to compete in the marketplace.

213.    Chemours' instructions, actions, and involvement as alleged herein were intended to and did interfere with Koura's performance of its obligations under the R-454B agreement between Koura and FluoroFusion.

214.    As a result of Chemours' intentional interference with the contract between FluoroFusion and Koura, Plaintiffs have suffered and will continue to suffer damages including lost sales and profits, reputational harm, and costs incurred for packaging and preparation for delivery of R-454B that never occurred.

**COUNT IX:  Tortious Interference with Prospective Economic Advantage (Chemours and Koura)**

215.    FluoroFusion and Dynatemp incorporate the allegations set forth in the paragraphs preceding Count I above.

216.    Upon information and belief, through their activities alleged herein, Defendants Chemours and Koura have intentionally induced one or more existing or potential customers not to enter into contracts to purchase R-454B or other refrigerants from Plaintiffs.

45

217.     Such existing or potential customers would have entered into agreements to purchase R-454B and other refrigerants from Plaintiffs but for Chemours and Koura's actions as alleged herein.

218.     Plaintiffs had a reasonable expectation of a continuing and growing business relationship with numerous customers who previously purchased various refrigerants from Plaintiffs. During the months that Defendants promised but refused to deliver R-454B to FluoroFusion, upon information and belief, Defendants solicited Dynatemp's prior customers and unjustifiably and maliciously induced these customers to purchase not only R454-B but also other refrigerants in the Chemours/Koura portfolio from Chemours and/or Koura, rather than continuing a business relationship with Plaintiffs.

219.     Upon information and belief, Chemours and Koura were aware of these customers' existing relationships with Plaintiffs, and exploited Plaintiffs' inability to obtain R-454B (which was carefully orchestrated by Defendants) to induce Plaintiffs' customers to cease purchasing refrigerants from Plaintiffs and instead conduct future business with Defendants, by bundling the purchase of the new refrigerant R-454B with other refrigerants.

220.     Chemours and Koura's inducement of prior and potential customers not to enter into contracts to purchase R-454B and other refrigerants from Plaintiffs was malicious and without justification, and, but for such inducement, such customers would have entered into contracts with FluoroFusion.

221.     As a direct and proximate result of the actions of Chemours and Koura, Plaintiffs' have sustained damages for the loss of prospective economic advantage, including loss of sales and profits and other damages in an amount to be proved at trial.

**COUNT X: Violation of North Carolina's Unfair and Deceptive Trade Practices Act § 75-1**
*et seq.*

222.    FluoroFusion and Dynatemp incorporate the allegations set forth in the paragraphs preceding Count I above.

223.    Chemours and Koura have directly affected commerce in North Carolina by blocking the purchase and sale of R-454B to FluoroFusion, to be delivered to it in North Carolina for resale and distribution by Plaintiffs, along with other refrigerants, to customers in North Carolina and throughout the United States.

224.    Defendants' predatory, exclusionary, unlawful conduct alleged herein constitutes unfair and deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1 *et seq.*

225.    As a direct and proximate result of such unfair and deceptive acts and trade practices,  Plaintiffs have sustained irreparable injury to their business, reputation, and goodwill, and will continue to do so unless Chemours' and Koura's unfair and deceptive acts and trade practices in violation of N.C. Gen. Stat. § 75-1 *et seq.* are enjoined.

226.    The unfair and deceptive acts and trade practices of Chemours and Koura as alleged herein were willful and malicious. Plaintiffs are therefore entitled to recover reasonable attorneys' fees incurred in connection with this action, pursuant to N.C. Gen. Stat. § 75-16.1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor on each count above and award them:

a.    All necessary and appropriate injunctive and equitable relief against Defendants' unlawful actions, including, without limitation, and order to desist from all their unlawful actions;

b. Damages sufficient to compensate for all costs, lost sales and profits, harm to their reputations, and all other harm they have suffered and will continue to suffer;

c. Threefold damages, costs, and interest pursuant to 15 U.S.C. §15(a) and/or N.C. Gen. Stat. § 75-16.1; and

d. Any and all other appropriate relief.

## PLAINTIFFS DEMAND A TRIAL BY JURY

This the 17th day of December 2024.

/s/ Brian A. Troyer
Brian A. Troyer (Ohio Bar No. 0059671)
PHV pending
Ruth E. Hartman (Ohio Bar No. 0078860)
*PHV pending*
Baker Hostetler
127 Public Square, Suite 2000
Cleveland, Ohio 44114-1214
Phone: 1-216-861-7309
Email: rhartman@bakerlaw.com
btroyer@bakerlaw.com
Attorneys for Plaintiffs

/s/ Emily Haas
Emily Haas
Michael Best & Friedrich LLP
4509 Creedmoor Road, Suite 501
Raleigh, NC 27612
Phone: 1-984-220-8745
Fax: 877-398-5240
Email: emhaas@michaelbest.com
NC Bar. No. 39716
*Local Civil Rule 83.1(d) Attorney for Plaintiffs*