IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-cv-716-BO-KS

FLUOROFUSION SPECIALTY )
CHEMICALS, INC., and DYNATEMP )
INTERNATIONAL, INC., )
 )
    Plaintiffs, )
 )
v. ) ORDER
 )
THE CHEMOURS COMPANY FC, LLC, )
and MEXICHEM FLUOR, INC., )
d/b/a KOURA, )
 )
    Defendants. )

    This cause comes before the Court on defendants' motions to dismiss for failure to state a claim. Defendant Mexichem Fluor, Inc., doing business as "Koura," moved to dismiss [DE 44], plaintiffs responded [DE 50], and Koura replied [DE 52]. The Chemours Company FC, LLC (Chemours), defendant, moved to dismiss [DE 46], plaintiffs responded [DE 49], and Chemours replied [DE 53]. A hearing was held before the undersigned on December 3, 2025, in Raleigh, North Carolina. In this posture, the motions are ripe for disposition. For the following reasons, the motions are granted.

## BACKGROUND

    In 2021, the Environmental Protection Agency (EPA) began phasing out the production, importation, and use of hydrofluorocarbons in refrigerants, mandating the substitution of refrigerants with lower global warming potential. Newly manufactured heating, ventilation, air conditioning, and refrigeration (HVAC/R) systems must comply with EPA regulations requiring the use of refrigerants with lower global warming potential. Chemours is a manufacturer of

chemical products. It developed R-454B, a refrigerant for use in residential and light commercial air conditioning and heat pumps, in response to the EPA regulations. Because R-454B has relatively low global warming potential, EPA regulations place it in high demand—many newly manufactured HVAC/R systems will require R-454B.

The following factual background is derived from plaintiffs' amended complaint [DE 34]. Koura is a producer and distributor of refrigerant products. Koura primarily distributed a coolant used for air-conditioning in cars, and the buyers with whom Koura had established relationships were car companies. In January 2024, Koura and Chemours entered an agreement for Koura to distribute R-454B. Because Koura lacked relationships with buyers who would be interested in R-454B, a residential air conditioning product, it sought a sub-distribution arrangement.

FluoroFusion Specialty Chemicals, Inc. (FluoroFusion) is a leading supplier of refrigerant products and refrigerant recovery services in the United States HVAC/R market. It distributes not only unused, "virgin" refrigerants, but also cleans up refrigerants that have already been put to use so that they can be re-sold and can continue to circulate. Because FluoroFusion sells many kinds of refrigerants, it had relationships with potential R-454B buyers. Koura sought a sub-distribution relationship with FluoroFusion. Koura hoped to be the middleman, receiving R-454B from Chemours and passing it on to FluoroFusion, so that FluoroFusion could sell it to its purchasers. In early January 2024, representatives from FluoroFusion and Koura spoke on the phone. Koura explained its situation, and allegedly "offered to sell 1-2 loads of R-454B and a minimum of 14 loads during the first year" of the contemplated sub-distribution arrangement. [DE 34, ¶ 34].

Various representatives of FluoroFusion and Koura then entered a long email correspondence, attempting to work out the terms of the agreement including price, number of shipments, and dates of shipment. Before Koura ever delivered a shipment of R-454B to

FluoroFusion, Chemours stepped in, imposing additional terms on the sub-distribution contract. Chemours refused to ship the product unless FluoroFusion agreed to a non-disparagement agreement under which it would be barred from making public statements critical of Chemours or its products. It also conditioned the sub-distribution on FluoroFusion's agreement to distribute the refrigerant only under the Koura brand or as an unbranded, generic product. Koura responded with surprise and distaste: "Chemours Commercial team is really raising a stink." [DE 38-12, Ex. L].

FluoroFusion found these new terms too oppressive to accept. In fact, it suspected Chemours' new terms were intentionally unacceptable, designed to stifle competition from other distributors by pushing plaintiffs out of the market. Plaintiffs filed this lawsuit, asserting various claims against both Chemours and Koura, including antitrust claims. They provide multiple theories of defendants' allegedly anticompetitive conduct. First, Chemours represents to the HVAC/R industry that it holds patents giving it exclusive rights to sell and reclaim R-454B in the United States. Plaintiffs contend this is a misrepresentation: that Chemours does not hold any such patent, and the threat of patent litigation is merely a wrongful attempt to chill competition. Plaintiffs also allege defendants conspired to monopolize the market for R-454B as well as the overall market for refrigerants in the United States by conditioning the sale of R-454B on the purchase of other refrigerants. In particular, plaintiffs allege Chemours poached two of their unnamed customers (Customers A and B) by leveraging the customers' need for R-454B. These customers were forced to buy other refrigerants from Chemours which they would otherwise have bought from plaintiffs.

Dynatemp International, Inc. (Dynatemp), another refrigerant distributor, is the other plaintiff in this case. Just like FluoroFusion, it alleges it lost business opportunities and sales

because of defendants' conduct, and purports to be a third-party beneficiary of the alleged contract between Koura and FluoroFusion.

Plaintiffs assert claims against both Koura and Chemours for conspiracy in restraint of trade, conspiracy to monopolize, sales conditioned on exclusive dealing, breach of contract, tortious interference with prospective economic advantage, and violation of North Carolina's Unfair and Deceptive Trade Practices Act. Plaintiffs also assert claims for actual and attempted monopolization and tortious interference with contract against Chemours, and plaintiffs seek a declaratory injunction that Chemours does not hold a patent giving it the exclusive right to manufacture, market, or reclaim R-454B in the United States. Defendants moved separately to dismiss all claims asserted against them.

## DISCUSSION

A 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted tests the complaint's legal and factual sufficiency. *See* Fed. R. Civ. P. 12(b)(6). The focus is on the pleading requirements under the Federal Rules, not the proof needed to succeed on a claim. "Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). This standard does not require detailed factual allegations, *id.*, but it "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Nadendla v. WakeMed*, 24 F.4th 299, 305 (4th Cir. 2022) (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at

4

570). For a claim to be plausible, its factual content must permit the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## I. Antitrust Claims

At the outset, both defendants argue the complaint fails to plausibly allege an "antitrust injury." In order to state a claim, plaintiffs must plausibly allege an injury of "the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

> The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause." The purpose of such a requirement is two-fold: "It ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws ... and it prevents losses that stem from competition from supporting suits by private plaintiffs for either damages or equitable relief."

*Supermarket of Marlinton, Inc. v. Valley Rich Dairy*, 161 F.3d 3 (4th Cir. 1998) (internal citations omitted). After all, "antitrust law aims to protect competition, not competitors[.]" *Microsoft Corp. v. Computer Support Servs. of Carolina, Inc.*, 123 F. Supp. 2d 945, 951 (W.D.N.C. 2000) (citations omitted). To establish that plaintiffs' injury is the type of injury the antitrust laws were intended to prevent, plaintiffs must demonstrate "injury to competition beyond the impact on the claimant." *Id.*

The broad question bearing on all the antitrust claims in this case is whether plaintiffs plausibly allege facts linking the harm they experienced to a market-wide harm flowing from an unlawful restraint. Defendants' central argument that plaintiffs fail to allege antitrust injury is that plaintiffs acknowledge there are other sources of refrigerant products than Chemours. "Chemours controls at least 85% of the sales of R-454B in the United States, and the sales of R-454B for approximately 75% of the U.S. HVAC/R systems and equipment manufactured after January 1,

5

2025." [DE 34, ¶ 83]. "The sales of R-454B in the United States is a highly concentrated market, with Chemours claiming exclusive rights to sell and reclaim R-454B in the United States, and with only one other U.S. distributor other than Defendants." *Id.* at ¶ 86. Because there are other distributors to which plaintiffs could turn, defendants argue their refusal to sell to plaintiffs on the conditions plaintiffs desired is not the kind of anticompetitive conduct necessary to support antitrust injury.

Defendants' reasoning is persuasive. Chemours offered to sell R-454B to plaintiffs subject to conditions. Plaintiffs rejected the offer. Even supposing for the sake of argument that the terms of Chemours' offer (the branding restrictions and non-disparagement agreement) were intentionally unacceptable, and therefore Chemours' offer to allow plaintiffs to sub-distribute R-454B does not evidence Chemours' willingness to allow plaintiffs' participation in the market, no injury arose if plaintiffs were able to acquire R-454B from another source. Furthermore, the injury plaintiffs suffered was to their marketing and branding: they could not be suppliers for Chemours unless they used Chemours' branding or distributed R-454B without branding as a generic product. This is an injury arising out of the contract negotiations. "[I]t is easy for a claim of breach—or simply contractual sour grapes—to 'masquerade as a candidate for treble damages.'" *Global Tel\*Link Corp v. JACS Sols. Inc.*, 708 F. Supp. 3d 784, 796 (E.D. Va. 2023) (quoting *Steves & Sons. Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 710 (4th Cir. 2021)). Rejecting Chemours' terms would have left plaintiffs in the same position whether or not there were any antitrust violation.

a. Conspiracy in Restraint of Trade and Conspiracy to Monopolize—15 U.S.C. §§ 1 and 2

A violation of §1 of the Sherman Act occurs when there is an "agreement in the form of a contract, combination, or conspiracy that imposes an unreasonable restraint on trade." *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 702 (4th Cir. 1991). Plaintiffs assert claims for conspiracy in

6

restraint of trade (Count II) and conspiracy to monopolize (Count IV). Plaintiffs fail to state a claim on either theory because they do not plausibly allege an agreement or conspiracy. Plaintiffs acknowledge that Chemours controls the terms of R-454B's distribution. When Chemours imposed conditions on FluoroFusion's sub-distribution opportunity, Koura had no recourse to provide the R-454B as contemplated unless FluoroFusion accepted the terms. Based on Koura's critical description of Chemours' new conditions, it does not seem the two defendants regarded their interests as aligned on this issue. Koura wanted to enter the sub-distribution agreement, and Chemours prevented it.

Plaintiffs note that conspiracies, often tacit or unwritten, may be inferred from allegations of circumstantial facts. *See Robertson v. Sea Pines Real Estate Companies, Inc.*, 679 F.3d 278, 290 (4th Cir. 2012). Indeed, they allege defendants dominate a concentrated market, which helps imply collusion, *see Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001); [DE 34, ¶¶ 22–24], that defendants' business relationship provides opportunity to conspire, *see In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010); [DE 34, ¶ 31], that Chemours was motivated to suppress its competitors for profit, and especially to suppress sales of reclaimed refrigerants, and that Koura's change in behavior implies a new conspiracy. Plaintiffs also allege that it would not have been in Koura's interest to abandon negotiations with plaintiffs without assurance that Chemours would not sell directly to Koura, cutting out the middleman. So, Koura's withdrawal from negotiations, being contrary to Koura's interest in the absence of a conspiracy, supports plausibility. *See Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 50 (1st Cir. 2013).

These astute observations do not, however, render an inference of conspiracy or collusion based on the alleged facts plausible. First, that Chemours and Koura operate in a concentrated market is irrelevant because they are in a vertical, not a horizontal relationship. *See Todd*, 275 F.3d

7

at 208 (market concentration is a factor increasing the likelihood of collusion in cases alleging *horizontal* conspiracy). Second, while suppressing competition can lead to increased profits, and this could well be a motivator, it is unclear how refusing to supply plaintiffs with virgin R-454B on plaintiffs' terms would suppress their refrigerant reclamation business.

Koura gets its R-454B from Chemours subject to the conditions Chemours imposes. Koura negotiated with plaintiffs because it lacked the resources to distribute R-454B on its own. Chemours imposed restrictions on Koura's contemplated sub-distribution agreement with plaintiffs. Koura expressed its displeasure to plaintiffs and Chemours, but eventually capitulated, apparently recognizing that resistance was futile. This story, which plaintiffs lay out in their amended complaint, does not support a plausible inference of collusion between defendants.

Plaintiffs' § 2 claim for conspiracy to monopolize fails for the same reason as their § 1 claim: the absence of a plausibly alleged conspiracy. "We do not see, on the basis of the facts alleged, how [plaintiff] could succeed on this claim without prevailing on its § 1 claim." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139 (1998).

b. Actual and Attempted Monopolization—15 U.S.C. § 2

Plaintiffs assert their claim for actual and attempted monopolization against only Chemours. To violate Section 2 of the Sherman Act, a defendant must "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. Therefore, either an actual monopoly or an attempt at monopoly falls under this section. The possession of monopoly power is only unlawful when coupled with anticompetitive conduct. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

8

Plaintiffs assert two theories of Sherman Act § 2 liability: first, that Chemours attempted to monopolize the market of "all refrigerants," and second, that Chemours actually monopolized the market for R-454B.

*i. Attempted Monopolization of the Market for "All Refrigerants"*

"An attempted monopolization offense consists of: (1) the use of anticompetitive conduct; (2) with specific intent to monopolize; and (3) a dangerous probability of success." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011). Accepting plaintiffs' alleged market of "all refrigerants" arguendo, the complaint must still allege Chemours' intentional anticompetitive conduct is dangerously likely to result in a monopoly of all refrigerants. Plaintiffs allege anticompetitive conduct including tying, exclusive dealing, threatening patent infringement litigation (over an allegedly imaginary patent), attacks on plaintiffs' reputations, and interference with the sub-distribution agreement with Koura. None of these allegations, however, creates a plausible inference that Chemours approached a dangerous likelihood of monopolizing the market for all refrigerants in the United States.

Plaintiffs' tying theory and its exclusive dealing theory are based on similar factual allegations. They allege Chemours conditioned sales of R-454B on the purchase of other refrigerants, forcing buyers "into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984). The allegation that Chemours threatens patent litigation based on an invalid patent is too thin for the Court to consider—plaintiffs do not specify the patent at issue or explain what Chemours falsely claims is covered. And while plaintiffs contend that Chemours "negatively marketed" against plaintiffs [DE 34, ¶ 67], plaintiffs elsewhere argued that the anti-disparagement requirement defendants demanded as a condition of providing them R-

454B was so imposing that it rendered the terms unacceptable. "[T]he terms Chemours and Koura sought to impose on Plaintiffs would have prohibited them from engaging in any comparative marketing ... [n]o competitor in the industry could operate subject to that disability. It was intended to be unacceptable." *Id.* at ¶ 58.

The complaint's allegations are insufficient to plausibly imply that Chemours could corner the market for all refrigerants in the United States. Even though it alleges Chemours has substantial power in the overall refrigerant market, there is no allegation regarding the profiles of the other competitors, how many they number, or their relative sizes compared to Chemours. There is no allegation of the profiles of buyers, either, or their refrigerant needs, in the overall refrigerant market. Put simply, the complaint fails to plausibly allege that enough buyers of refrigerants in general are so dependent on access to R-454B that Chemours could monopolize the overall refrigerant market by conditioning access to R-454B on the purchase of other tied refrigerants. Without plausibly alleging a dangerous probability that Chemours could monopolize the overall refrigerant market, plaintiffs fail to state a claim for attempted monopolization. *See Kolon Indus., Inc.*, 637 F.3d at 441.

*ii. Actual Monopolization of the Market for R-454B*

"To prove a Section 2 monopolization offense, a plaintiff must establish two elements: (1) the possession of monopoly power; and (2) willful acquisition or maintenance of that power—as opposed to simply superior products or historic accidents." *Id.* The amended complaint lays out the same allegations to establish actual monopolization of the market for R-454B as to establish attempted monopolization of the refrigerant market overall, namely, tying and exclusive dealing. However, because tying or exclusive dealing would benefit the tied product (that is, the refrigerant other than R-454B, as Chemours is already dominant in the market for R-454B), the load-bearing

10

allegations related to this claim are that Chemours fraudulently claims patent protection to deter competitors and that Chemours refused to deal with plaintiffs.

As mentioned previously, the complaint contains insufficient allegations to plausibly conclude that Chemours falsely claims patent protection to deter competition. As for the alleged refusal to deal, Chemours persuasively argues that there was none: in fact, Chemours offered to distribute R-454B to plaintiffs under certain conditions, and they refused. "[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Curtis V. Trinko, LLP*, 540 U.S. at 408 (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). Furthermore, as already discussed, the injury to plaintiffs' branding and marketing arising from Chemours' conditions of the R-454B sale is unconnected to any market-wide harm flowing from anticompetitive conduct and does not constitute an "antitrust injury." *See Brunswick Corp.*, 429 U.S. at 489.

c. Sales Conditioned on Exclusive Dealing under 15 U.S.C. § 14

The Clayton Act provides a remedy for exclusive-dealing claims. 15 U.S.C. §14. There are three requisite elements: an arrangement, in a line of commerce and area of effective competition, that forecloses competition in a substantial share of the relevant market. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). Plaintiffs again rely on their theory that by conditioning sale of R-454B on the purchase of other refrigerants, defendants inhibit competition for customers of those other refrigerants.

Plaintiffs allege that two of their unnamed customers, Customer A and Customer B, were victims of Chemours' tying scheme. "Chemours' strategy includes accepting orders for a large amount of R-454B but then only shipping a smaller amount of it and further delaying shipment

11

until the customer also agrees to buy other refrigerant products. As a result, Plaintiffs have lost significant sales of those products to [these customers]." [DE 34, ¶ 63]. Allegations regarding these two customers, however, are insufficient to create a plausible inference that the alleged tying foreclosed competition in a substantial share of the relevant market. As Chemours argues, "Plaintiffs make no allegations regarding the percentage of total customers that Defendants allegedly foreclosed to them through exclusive dealing and seem to imply it was only two." [DE 47, pp. 12–13].

## II. State Law Claims and Declaratory Judgment

In addition to their antitrust claims, plaintiffs assert claims for breach of contract, tortious interference with a prospective economic advantage, and violation of North Carolina's Unfair and Deceptive Trade Practices Act against both defendants. They assert a claim for tortious interference with a contract against Chemours. They also seek a declaratory judgment that Chemours' purported patent is invalid.

a. Declaratory Judgment

Plaintiffs allege that Chemours has represented to the industry that it "holds patent rights to R-454B" giving it "exclusive rights to manufacture, distribute, and/or reclaim R-454B" when it does not. [DE 34, ¶¶ 91, 96, 97]. They allege that Chemours' product labels and marketing materials do not identify any patents. *Id.* at ¶ 96. This is about the whole extent of the relevant factual allegations, and it is almost nothing to go on. No party has identified a specific patent whose scope is disputed nor described what part of the manufacturing or reclamation process the alleged patents cover or do not cover. As Chemours put it, plaintiffs "ask this Court to do its own search for a patent that Plaintiffs suggest does not exist and confirm that it does not exist[.]" [DE 47, p. 29]. Plaintiffs fail to state a claim for declaratory relief.

b. Breach of Contract

The elements of breach of contract are: (1) the existence of a valid contract and (2) a breach of the terms of the contract. *Poor v. Hill*, 138 N.C. App. 19, 26 (2000). "A valid contract requires mutual assent, consideration, and terms that are sufficiently definite to enable a court to enforce them." *Ehmann v. Duke Energy Carolinas, LLC*, No. 3:19-CV-00311-RJC-DSC, 2020 WL 958909, at *2 (W.D.N.C. Feb. 27, 2020). "To prove that a valid contract existed, the plaintiff must show that 'there has been a meeting of the minds as to all essential terms of the agreement.'" *Jackson v. Minnesota Life Ins. Co.*, 275 F. Supp. 3d 712, 735 (E.D.N.C. 2017) (citation omitted). The purported breach of contract here arises from FluoroFusion's negotiations with Koura for shipments of R-454B. After Chemours imposed conditions on the sale, it fell through.

Koura contends that it haggled with FluoroFusion over terms but never came to any agreement. In response, FluoroFusion references its lynchpin allegation: that in early January 2024, "Koura offered to sell 1-2 loads of R-454B and a minimum of 14 loads in the first year," and "FluoroFusion accepted this offer." [DE 34, ¶ 34]. The question is whether, at any point during the negotiations, the parties reached a meeting of the minds as to the essential terms of the agreement and thereby entered a valid contract. The exhibits attached to the amended complaint—a string of email correspondences between FluoroFusion and Koura—reveal there was no mutual assent as regarding, at least, the price and quantity of the shipments.

On January 3, 2024, Koura representatives emailed FluoroFusion asking about its 2024 demand, trying to discern the number of deliveries they should expect to make. FluoroFusion responded by asking about the pricing for different sizes of bulk shipment. [DE 38-1, Ex. A]. FluoroFusion submitted a purchase order dated January 19, 2024 to Koura, requesting a single shipment at a fixed price. [DE 38-2, Ex. B]. Koura responded indicating it would keep

13

FluoroFusion posted. [DE 38-3, Ex. C]. By April 10, 2024, no shipment had been made; FluoroFusion wrote to Koura asking how many more loads would be available after the first was delivered. Koura responded that the first load should be delivered later that month, and that the next load would be available in May or June. [DE 38-4, Ex. D]. On April 15, Koura representatives informed FluoroFusion that they "finally have Chemours set up," and Koura "should hear from [Chemours] in the next few days on a delivery date to [FluoroFusion]." [DE 38-5, Ex. E]. On April 18, FluoroFusion responded, explaining that it was prepared to unload the product once delivered. Koura replied that it hoped to have a delivery date by the end of the week. [DE 38-6, Ex. F].

On April 26, FluoroFusion asked if Koura had confirmed a delivery date. Koura responded they had not scheduled a delivery date and were still waiting on Chemours to get back to them. Koura apologized for the inconvenience. [DE 38-7, Ex. G]. On May 6, Koura again wrote to delay the shipment. The email reads, "Koura 's promises will [sic] get it delivered to you by the end of this month." [DE 38-8, Ex. H]. The next email exchange occurred after FluoroFusion attended an online safety conference scheduled by Chemours, projecting a June 5 delivery date, and discussing offload procedures for the shipment. [DE 38-9, Ex. I]. On June 4, the day before the projected delivery, Koura wrote, "Chemours is delaying your 454B delivery . . . I'm shocked since we were told a while ago, we were good to go." [DE 38-10, Ex. J].

Despite plaintiffs' contention that a contract for 14 shipments of R-454B within the year had been formed on a phone call, the subsequent email correspondence reveals that no meeting of the minds occurred regarding the number of shipments or the price. Nor did a meeting of the minds occur later in the email correspondence. While Koura did say it promised a shipment by the end of May 2024, it had already described the need for Chemours' approval multiple times. [DE 38-5, Ex. E]; [DE 38-7, Ex. G]. FluoroFusion knew that the deal was conditioned on Chemours'

approval, and based on the continued delay of shipments (it had already been several months since the initial phone call), Koura's promise to deliver by the end of May reflected a mere expectation that a contract would result from the negotiations and that delivery would be feasible shortly thereafter.

The parties do not refer to the allegedly agreed-upon number of fourteen shipments. Rather, the parties negotiated the terms of a contemplated contract which, to both Koura's and FluoroFusion's dismay, Chemours did not approve. Because there was no mutual assent and no valid contract, plaintiff fails to state a claim for breach of contract against both Koura and Chemours.

c. Tortious Interference with Prospective Economic Advantage and with Contract

Plaintiffs assert claims for tortious interference with a prospective economic advantage against both defendants and a claim for tortious interference with contract against Chemours. To state a claim for tortious interference with contract, plaintiffs must plead "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff." *Beverage Sys. of the Carolinas, LLC v. Assoc. Beverage Repair, LLC*, 368 N.C. 693, 700 (2016) (citation omitted). A claim of tortious interference with prospective economic advantage "arises when a party interferes with a business relationship 'by maliciously inducing a person not to enter into a contract with a third person, which he would have entered into but for the interference[.]'" *Id.* at 701 (citation omitted). A claim for tortious interference with a prospective economic advantage has the same elements as a claim for tortious interference with contract, except instead of an existing contract, "there must be a contract that would have been

15

entered into but for the defendant's conduct." *Spirax Sarco Inc. v. SSI Eng'g, Inc.*, 122 F. Supp. 3d 408, 421 (E.D.N.C. 2015).

Plaintiffs base their claim for tortious interference with a prospective economic advantage on Chemours' alleged tying of other refrigerants to R-454B. Chemours, not Koura, is the only party with the power to enforce this arrangement. The complaint alleges no act by Koura, product tying or otherwise, that interfered with plaintiffs' business relationships.

Having determined that Koura and FluoroFusion did not enter a contract for the sale of R-454B, the Court dispenses with the theory that Chemours interfered with that contract. Plaintiffs' other theory supporting their tortious interference claims is based on Chemours' alleged tying and negative marketing, which drew plaintiffs' customers—potentially repeat customers—away from plaintiffs.

To establish the "without justification" element of their tortious interference claims, plaintiffs depend on the wrongfulness of defendants' acts under antitrust law. The Court has already determined that plaintiffs fail to state an antitrust claim. "[C]ompetition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful." *Krawiec v. Manly*, No. 15 CVS 1927, 2016 WL 374734, at *14 (N.C. Super. Jan. 22, 2016). Chemours is privileged as a competitor, and its alleged conduct was not tortious.

d. Unfair and Deceptive Trade Practices Act

Plaintiffs depend on the allegations related to their Sherman Act claims and defendants' alleged abuse of the patent system to carry their Unfair and Deceptive Trade Practices Act claims. The Court finds no Sherman Act violation or wrongful conduct associated with patent. Plaintiffs fail to state a claim.

### III. Motion to Seal; Other Pending Motions

Koura [DE 28] and Chemours [DE 30] each moved to dismiss the original complaint. Because plaintiffs filed an amended complaint as a matter of course, those motions are denied as moot. Plaintiffs also moved to seal their amended complaint. [DE 36].

A judicial record is subject to the public's common law right of access, at a minimum, and might be subject to the heightened right of access afforded by the First Amendment. *Bayer Cropscience Inc. v. Syngenta Crop Prot.*, LLC, 979 F. Supp. 2d 653, 655 (M.D.N.C. 2013). In considering a motion to seal, a court should provide the public with notice of the request to seal and support its decision by specific findings, including whether alternatives to sealing are appropriate. *In re Knight Pub. Co.*, 743 F.2d 231, 235 (4th Cir. 1984). "One exception to the public's right of access is where such access to judicial records could provide a 'source[ ] of business information that might harm a litigant's competitive standing.'" *Woven Elecs. Corp. v. Advance Grp., Inc.*, 930 F.2d 913 (4th Cir. 1991) (alterations in original) (quoting *Nixon v. Warner Communications*, 435 U.S. 589, 598 (1978)).

The amended complaint contains potentially sensitive confidential business information. Plaintiffs have filed a lightly redacted public copy of their amended complaint, removing only price figures. The redacted portions have minimal bearing, if any, on public matters. The motion to seal has been pending for some time and no member of the public has objected. The motion to seal is granted.

### CONCLUSION

For the foregoing reasons, defendants' motions to dismiss the amended complaint [DE 44]; [DE 46] are GRANTED. Defendants' motions to dismiss the original complaint [DE 28]; [DE 30]

17

are DENIED as MOOT. Plaintiff's motion to seal [DE 36] is GRANTED. The Clerk is DIRECTED to close the case.

SO ORDERED, this __19__ day of February 2026.

                                              TERRENCE W. BOYLE
                                              UNITED STATES DISTRICT JUDGE